UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CERTAIN LONDON MARKET
COMPANY REINSURERS,
    Plaintiffs,

v.                                                           CIVIL ACTION NO. 18-10534-NMG

LAMORAK INSURANCE
COMPANY, f/k/a ONEBEACON
AMERICA INSURANCE
COMPANY,
    Defendant.

MEMORANDUM AND ORDER ON CERTAIN LONDON MARKET COMPANY
REINSURERS' MOTION TO COMPEL (#100).

KELLEY, U.S.M.J.

This case is a reinsurance contract dispute. Plaintiffs, Certain London Market Company Reinsurers (LMR), filed a motion to compel, defendant, Lamorak Insurance Company (Lamorak), opposed, and LMR replied. (##100, 101, 104, 114.) Oral argument was held on September 25, 2020, on this motion and another pending motion (Lamorak's motion for protective order, #108), after which the court ordered Lamorak to submit its privilege log and documents to the court for ex parte review. (#127.) On September 30, 2020, the court held an ex parte hearing with counsel for Lamorak to ask questions about the privilege log and certain documents. (#131.) On October 5, 2020, the court held a further argument on this motion and Lamorak's motion for protective

order. (#136.) For the reasons set out below, plaintiffs' motion is allowed in part and denied in part.

## I. Facts.

In 1970, Lamorak issued three excess liability policies to its insured, Olin Corporation (Olin). (#1-1 at 7.) LMR reinsured Lamorak for its liability under three facultative reinsurance contracts (the Reinsurance Contracts). *Id.* at 8.[1] Starting in the 1970s, Olin, a chemical manufacturing company, was held liable for the costs of remediating pollution at various sites. Beginning in 1983, Olin sued several of its insurers, including Lamorak, seeking indemnification for these costs. Litigation has continued on a site-by-site basis for more than thirty-five years. *See generally Olin Corp. v. OneBeacon Am. Ins. Co.,* 864 F.3d 130 (2d Cir. 2017). In 2013, Olin and Lamorak went to trial in the Southern District of New York (the Olin Action) with respect to five Olin remediation sites (the Five Sites). *Id.* at 140-41. In 2015, after a jury trial, the district court entered judgment in favor of Olin against Lamorak in the amount of $87,187,173.63. *Id.* at 142. On appeal, the Second Circuit affirmed as to Lamorak's liability, but vacated the judgment and remanded for recalculation of damages. *Id.* at 135 n.1.

On May 1, 2018, the district court entered a judgment in favor of Olin respecting the Five Sites, consisting of about $55 million in damages and $75 million in pre-judgment interest, for a total of about $130 million. (#102-1 at 3.) The judgment further ordered: "[I]f the London Market Insurers are found liable to Lamorak in contribution in the proceeding now pending in New York

---

[1] Facultative reinsurance is "a type of reinsurance coverage that applies to a single policy or risk and is negotiated on an individual basis." (#1-1 at 7.)

State court, an amended judgment will then issue reducing the amount of the entered judgment by the amount of that contribution, plus the pre-judgment interest corresponding to that amount." *Id*.[2]

On August 28, 2018, trial began in the Olin Action in connection with fifteen other sites (the Remaining Sites). *Id*. at 6. According to Lamorak's memorandum in opposition to LMR's motion to compel, Olin claimed past damages of about $36 million dollars and future costs of about $27 million. (#104 at 4.) Olin and Lamorak reported the case settled on August 30, 2018, just four days after the start of the trial. (#102-1 at 6.) They settled all claims concerning the Five Sites and the Remaining Sites (with the exception of one site); Lamorak paid Olin $120 million. (#104 at 4.)

Lamorak then billed LMR on September 7, 2018 (the Allocation), seeking payment from LMR under the simultaneous payments clause in the Reinsurance Contracts. *Id*. at 5. LMR asserts that Lamorak's Allocation, which did not follow the same allocation of funds between liability and pre-judgment interest as the district court's May 1, 2018 judgment concerning the Five Sites, is not reasonable. (#100 at 2-3.)[3] Where the district court divided the $130 million judgment between $55 million in damages and $75 million in pre-judgment interest, Lamorak's Allocation assigned only $15 million of the $120 million settlement amount to pre-judgment interest, and only assigned pre-judgment interest to the Five Sites, with no pre-judgment interest allocated to the fifteen Remaining Sites. *Id.* at 2. The balance of $105 million was assigned to liability at the Five Sites and the Remaining Sites. *Id*.

---

[2] Lamorak was suing other Olin insurers regarding the Five Sites in the New York Supreme Court. *See Lamorak Ins. Co. v. Certain Underwriters at Lloyds, et al.*, No. 656466/2017 (N.Y. Supr. Ct., N.Y.Cty.).

[3] The parties dispute the standard to be applied and who bears the burden of proof concerning whether the Allocation will pass muster. (Compare #114 at 1-2, with #104 at 9 and #107 at 4.) It suffices here to note that no matter how that dispute is resolved, the Allocation must be found to be reasonable.

II. The Parties' Dispute.

A. The Privilege Log.

LMR asks the court to order Lamorak to produce materials that Lamorak lists on a privilege log. *Id*. at 5. The privilege log consists of forty-two emails and attachments, primarily between Attorney Mark Muth, Senior Vice President and Special Counsel at Resolute Management, Inc. (Resolute), and other Resolute employees, some of them attorneys. (#102-9; #105 at 1.) In his declaration, Attorney Muth avers that "Resolute acted as administrator for Lamorak respecting certain insurance business, including claims by [Olin] under Lamorak policies at issue [in the Olin Action]." (#105 at 1.) He states that he "managed the Olin Action for Lamorak from November 2010 on and negotiated the Lamorak settlement with Olin executed on August 31, 2018." *Id*. He "made the decision on how to allocate [the $120 million settlement with Olin] to the potential exposures released under the settlement[,]" and he "communicated in confidence with other Lamorak representatives respecting the Olin Action, the settlement, and the allocation." *Id*. at 2.

Some of the emails include Marc Scarcella of Roux Associates, Inc. (Roux), a consulting firm, where Scarcella leads "the Economic and Complex Analytics practice." (#106 at 1.) Scarcella assisted Attorney Muth "in the settlement negotiations by creating spreadsheets that quantified certain Olin exposure scenarios at [Attorney Muth's] direction." (#105 at 1.) Scarcella was both a testifying expert in the Olin Action and a non-testifying consulting expert concerning the Olin exposure scenarios, which were used in negotiating the settlement with Olin. (#106 at 1.) Scarcella states in his declaration that he was the only person at Roux who worked on the exposure scenarios. *Id*. at 2.

The emails are dated from August 23, 2018 to September 6, 2018. (#102-9.) Lamorak and Olin executed the settlement of the Olin Action on August 31, 2018, and Lamorak then billed

LMR on September 7, 2018, so the documents are all from the precise time period in which Lamorak was settling the Olin litigation and drafting the Allocation in order to bill LMR. Thirty-six of the documents are dated before August 31, 2018, and so pre-date the execution of the settlement in the Olin Action. *Id*.

B. <u>LMR's Position</u>.

LMR refuses to pay the Allocation, in large part because LMR asserts that the Reinsurance Contracts do not cover pre-judgment interest, and the Allocation unreasonably minimizes the pre-judgment interest for which Lamorak is liable. (#101 at 2.) LMR argues that Lamorak "appears to have assigned inflated values for future costs at the Five Sites and past and future costs at the Remaining Sites, in order to disguise what was in reality a payment for years of interest on all of the sites." *Id*. at 6. LMR seeks "clarification from Lamorak as to its rationale" for the Allocation. *Id*. at 5. LMR complains that "Lamorak has refused to produce *a single communication or document* concerning its Post-Settlement Allocation, other than the Allocation itself." *Id*. at 2 (emphasis in original).[4] LMR disputes that the documents listed on the privilege log are protected, arguing that even if an attorney was a party to the communications, the documents are business records, created in order to bill reinsurers, and not attorney work-product. *Id.* at 12-18.

LMR further asks the court to order Lamorak to search the files of Scarcella, the consultant who assisted Muth, and to order Lamorak to produce relevant communications and documents from those files. *Id*. at 18-20. LMR asserts that it is unfair for Lamorak to proffer Attorney Muth

---

[4] The Allocation provided to LMR included two spreadsheets, which attributed portions of the $120 million settlement amount to past and future costs at each of the Five Sites and Remaining Sites, as well as to pre-judgment interest on the past costs at the Five Sites. (#102-2 (allocation spreadsheets).)

and Scarcella as fact witnesses to testify about how Lamorak decided to allocate the settlement amount, the key issue in the case, without also producing their communications. *Id*. at 8-9, 11-12.

B. Lamorak's Position.

Lamorak asserts that the documents on its privilege log are protected by the attorney-client privilege and/or the work-product doctrine. (#104 at 7.) Lamorak characterizes Attorney Muth as "the lawyer who was managing a hotly contested, high-stakes coverage litigation [the Olin Action]," and who utilized Scarcella to assist in crunching numbers during settlement negotiations. *Id*. at 1, #105 at 1-2.

With regard to the work-product privilege, Lamorak notes that there were two litigations ongoing during the time period covered by the documents: the Olin Action, which was settled on August 31, 2018, and "the Lamorak litigation with its reinsurers respecting Olin, including this case filed by LMR." (#104 at 7.)[5] With regard to the attorney-client privilege, Lamorak argues that the records "are principally those of [Attorney Muth,] who managed the coverage litigation with Olin, negotiated a settlement of that litigation with Olin, and communicated internally about the settlement with other Lamorak representatives." *Id*.

### III. The Law Pertaining to Privilege.

Federal Rule of Civil Procedure 26(b)(1) provides that parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Although Lamorak argues that the materials are irrelevant, the court rejects that argument and finds that the only question is whether they are privileged. Under Federal Rule of Evidence 501, federal courts sitting in diversity

---

[5] This case was originally filed in the Suffolk Superior Court on March 15, 2018, and was removed to this court on March 20, 2018. (##1, 1-1.)

jurisdiction apply the substantive law of the forum state to resolve questions of attorney-client privilege, and federal common law to resolve questions of attorney work-product. *See* Fed. R. Evid. 501. Lamorak, seeking to protect the documents, bears the burden of establishing that they are privileged. *Maine v. U.S. DOI*, 298 F.3d 60, 71 (1st Cir. 2002). "If the privilege is established and the question becomes whether an exception to it obtains, the devoir of persuasion shifts to the proponent of the exception." *F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000) (citation omitted).

Under Massachusetts law, the attorney-client relationship "comes into being 'when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.'" *Id.* at 461 (quoting *DeVaux v. Am. Home Assur. Co.*, 444 N.E.2d 335, 357 (Mass. 1983)). "The attorney-client privilege not only protects statements made by the client to the attorney in confidence for the purpose of obtaining legal advice in a particular matter, but also protects such statements made to or shared with necessary agents of the attorney or the client, including experts consulted for the purpose of facilitating the rendition of such advice." *Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs., Inc.*, 449 Mass. 609, 616 (2007) (citations omitted).

The attorney work-product doctrine was first established in *Hickman v. Taylor*, 329 U.S. 495 (1947), "and focused at the outset on the materials that lawyers typically prepare for the purpose of litigating cases." *U.S. v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 26 (1st Cir. 2009) (en banc). The doctrine is partially codified in Fed. R. Civ. P. 26(b)(3), which protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer,

or agent)." Fed. R. Civ. P. 26(b)(3)(A). The First Circuit elaborated on the attorney work-product doctrine in *Textron*, explaining that work-product protection is focused on "materials prepared for use in litigation, whether the litigation was underway or merely anticipated." *Textron*, 577 F.3d at 29. The court continued: "[M]aterials assembled in the ordinary course of business . . . or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." *Id.* at 30 (quoting Fed. R. Civ. P. 26 advisory committee's note (1970)); *see U.S. ex rel. Wollman v. Mass. Gen. Hosp., Inc.,* No. CV 15-11890-ADB, 2020 WL 4352915, at **9-10 (D. Mass. July 29, 2020); *Zagklara v. Sprague Energy Corp.*, No. 2:10-cv-445-JAW, 2011 WL 13209818, at *2 (D. Me. Jun. 22, 2011) (holding that materials assembled in the ordinary course of business are not protected, even if prepared by lawyers and reflecting legal thinking).

Work-product protection is not an absolute privilege. *See Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 19-20 (1st Cir. 2012). Fed. R. Civ. P. 26 (b)(3) provides that materials that are prepared in anticipation of litigation may nevertheless be discoverable if they are otherwise discoverable under Rule 26(b)(1) and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i), (ii).

IV. <u>Analysis</u>.

The court has reviewed the documents listed on the privilege log. All the documents relate to the allocation of the settlement amount for purpose of the reinsurance billing. With the exception of document #8, which asks for legal advice from Attorney William Sneed, none of the documents explicitly seek or give legal advice. At the outset, the court notes that Attorney Muth, in his declaration, never states that the withheld documents contain or seek legal advice, or that they are attorney work-product. (#105.) It is clear that Attorney Muth was not representing Lamorak as

counsel in a traditional sense. In his declaration, Attorney Muth never states that he represents Lamorak, saying instead that his company "acted as administrator for Lamorak respecting certain insurance business, including claims" by Olin, that he "managed the Olin Action for Lamorak" and "negotiated the Lamorak settlement with Olin," and that he "made the decision on how to allocate" the $120 million settlement with Olin "to the potential exposures released under the settlement." (#105 at 1-2.) The court does not know whether Attorney Muth negotiated the settlement with the assistance of other attorneys who represented Lamorak, or if he alone negotiated it. Attorney Sneed, in his declaration, states that he represents Lamorak, and then repeats that Attorney Muth "managed the Olin Action on behalf of Lamorak, negotiated the August 31, 2018 settlement with Olin, and made the decision on how to allocate the settlement payment." (#107 at 1, 4.) The court finds that, given the state of the record in this matter, Lamorak has not met its burden to establish that the documents are protected by the attorney-client privilege (other than document #8). Attorney Muth's work on behalf of Lamorak seems to have been akin to that of a consultant rather than an attorney representing a client.

The question then is whether the documents are protected under the work-product doctrine. The attachments are based on legal scenarios, that is, in them, Attorney Muth analyzes and attempts to quantify Lamorak's exposure based on various past court rulings and outstanding legal disputes. The court presumes that, if Olin had moved to obtain these documents, they would have been found to be protected. Lamorak argues that, if they are protected as to Olin, they should be protected as to LMR. (#104 at 7.) The court disagrees. Even if the documents are protected as to Olin, they are not as to LMR, for the following reasons.

It is undisputed that in insurance cases, communications with an attorney are not protected under the attorney-client privilege or work-product doctrine, where the attorney performs the role

9

of a claims adjuster and does not provide legal advice. *See*, e.g., *OneBeacon Ins. Co. v. Forman Intern., Ltd.,* No. 04-cv-2271(RWZ), 2006 WL 3771010, at *6 (S.D.N.Y. Dec. 13, 2006) ("OneBeacon cannot assert the attorney-client or work-product privilege in an effort to avoid producing the OneBeacon documents prepared in the ordinary course of an insurer's business."); *Chi. Meat Processors, Inc. v. Mid-Century Ins. Co.*, No. 95-cv-4277, 1996 WL 172148, at *3 (N.D. Ill. April 10, 1996) ("In the insurance context, to the extent that an attorney acts as a claims adjuster, claims process supervisor, or claims investigation monitor, and not as a legal advisor, the attorney-client privilege does not apply."). The court accepts LMR's argument that, in a typical reinsurance case, the preparation of the reinsurance allocation is a claims function that a business person undertakes to support a reinsurance billing, and so materials pertaining to that process are not privileged. (#114 at 7.) The court further agrees with LMR that, because the reasonableness of the Allocation is at the heart of the dispute in this matter, LMR is entitled to obtain documents that test whether the Allocation is consistent with Lamorak's actual exposure. *Id*. at 4. This is particularly true where Lamorak has proffered Muth and Scarcella as fact witnesses concerning the reasonableness of the Allocation. It would be unfair for these witnesses to be able to assert, on the one hand, that the Allocation was reasonable, and to explain why, but at the same time, refuse to produce documents or answer certain questions about how the Allocation was derived, claiming that such information is protected.

This is not to say that the question here is an easy one. The parties do not cite, and the court has not found, legal precedent precisely on point. This is an unusual case. Lamorak is correct that the materials reflect complex legal analysis, as described above, and that at the time the documents were generated, Lamorak was embroiled in litigation with both Olin and LMR. Nevertheless, the documents, even if they are based on an attorney's exposure analyses in the Olin Action, reflect

10

Lamorak's insurance administrators' rationale for the billing to LMR, which would have been prepared whether there was litigation or not. *See U.S. DOI*, 298 F.3d at 70 (quoting *U.S. v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)) ("[T]he 'because of' standard does not protect from disclosure 'documents that . . . would have been created in essentially similar form irrespective of the litigation.'"); *see also Textron*, 577 F.3d at 29-31 (same). On balance, the court finds that notwithstanding the tortuous history and complex legal questions involved in resolving the Olin Litigation, the preparation of the Allocation was "ordinary course" insurance claims adjustment, and not legal advice or work-product privileged from discovery. *See AIG Ins. Co. v. TIG Ins. Co.*, No. 07-cv-7052(SHS)(HBP), 2008 WL 4067437, at *12-13 (S.D.N.Y. Aug. 28, 2009) (citations omitted) (noting that "[a]pplication of the work-product doctrine to an insurance company's claims files" is "particularly troublesome," and endorsing a flexible approach to deciding whether insurance documents are prepared in anticipation of litigation); *see also* 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2024 at 343 (2d ed. 1994) ("[T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.").

Even assuming, *arguendo*, that the documents are protected under the work-product doctrine, the court would still order that they be produced under Fed. R. Civ. P. 26 (b)(3), which provides that materials that are prepared in anticipation of litigation may nevertheless be discoverable if they are otherwise discoverable under Rule 26(b)(1) and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i), (ii). For the reasons

set out above, LMR has substantial need for these documents, and it cannot get them in any other way.

For the same reasons that the court orders that Lamorak produce the documents on the privilege log, the court orders that Lamorak shall produce materials concerning Scarcella's work on the case.

V. <u>Conclusion</u>.

LMR's Motion to Compel (#100) is allowed in part and denied in part. Lamorak shall provide the materials on its privilege log to LMR, with the exception of document #8 and its attachment. If Lamorak so requests, the documents shall be subject to a protective order to be negotiated by the parties. LMR's motion that the files of Roux be searched for responsive documents and communications in the possession, custody, or control of Roux, regardless of date, that bear on the allocation of the $120 million settlement with Olin as reflected in the reinsurance billing sent to LMR, is allowed. Those materials likewise may be the subject of a protective order, if Lamorak so requests.

October 13, 2020                    /s/ M. Page Kelley
                                    M. Page Kelley
                                    Chief United States Magistrate Judge