**United States District Court**
**District of Massachusetts**

| | | |
|---|---|---|
| **Certain London Market Company Reinsurers,** <br> **Plaintiffs,** <br> **v.** <br> **Lamorak Insurance Company,** <br> **Defendant.** | ) | **Civil Action No. 18-10534-NMG** |

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises out of a reinsurance coverage dispute between Certain London Market Company Reinsurers ("LMRs" or "plaintiffs") and Lamorak Insurance Company ("Lamorak" or "defendant") concerning coverage of environmental damage costs offered by Lamorak to its insured, Olin Corporation ("Olin"), a chemical manufacturing company.[1] In the wake of a 2018 settlement between Lamorak and Olin, plaintiffs seek declaratory

[1] LMRs include Turegum Insurance Company, Assicurazioni Generali S.p.A. UK Branch, National Casualty Company, National Casualty Company of America Ltd., Dominion Insurance Company Ltd., Stronghold Insurance Company Ltd., and Allianz Suisse VersicherungsGesellschaft AG. Since January, 2020, all claims asserted by or against Stronghold Insurance Company Ltd. have been stayed in light of its insolvency-related proceedings pending in England.

judgment limiting their obligation to reimburse the defendant under the terms of that settlement.

Pending before the Court are plaintiffs' motion for summary judgment and defendant's motion to "realign" the parties.

## I. Background

In 1970, Lamorak issued three liability insurance policies to Olin for identical three-year periods from 1970 to 1973 ("the Olin Policies"). LMRs, in turn, reinsured 100 percent of Lamorak's obligations under the first two policies and 95 percent of its obligation under the third policy pursuant to reinsurance agreements ("the Slip Reinsurance Agreements"). At the time, Lamorak's predecessor was an insurance company domiciled in Massachusetts with its principal place of business in Boston. Lamorak has since re-domesticated to Pennsylvania.

Following numerous environmental claims brought against Olin, it commenced insurance coverage actions in the 1980s against several of its insurers, including Lamorak's predecessor. In those proceedings, Olin sought indemnification for the costs related to environmental damage at numerous manufacturing sites throughout the United States. In 2013, Olin and Lamorak proceeded to trial in the United States District Court for the Southern District of New York ("the Olin Court") regarding the claims stemming from five of those sites ("the

Five Sites") and judgment was ultimately entered in 2015 in favor of Olin. After an appeal to and a remand from the Second Circuit, the Olin Court awarded Olin roughly $130 million comprised of $55 million in damages and $75 million in prejudgment interest ("PJI").

In August, 2018, trial began with respect to the 15 remaining sites. Shortly thereafter, Lamorak and Olin reached a global settlement encompassing the Five Sites and all remaining sites for $120 million. In allocating the settlement proceeds, Lamorak calculated Olin's aggregate clean-up costs to be approximately $104 million and allocated that amount to damages. The remaining $16 million was allocated to PJI. One week later, Lamorak billed LMRs for their alleged shares of the settlement.

Anticipating that Lamorak would seek indemnification under the Slip Reinsurance Agreements, LMRs filed a complaint against Lamorak in Massachusetts Superior Court for Suffolk County prior to receiving that bill. Lamorak subsequently removed the case to this Court.

In their complaint, plaintiffs seek declaratory judgment that they are not obligated to reimburse defendant for: (1) loss incurred as a result of defendant's purported breach of the duty of utmost good faith, (2) amounts seeking repayment of expenses incurred by Lamorak in its litigation with Olin and (3) billings

seeking repayment of amounts that exceed the limits of the Reinsurance Contracts. In response, Lamorak asserts counterclaims for breach of contract and for unfair and deceptive conduct in violation of M.G.L. c. 93A, § 11.

In March, 2021, LMRs moved for summary judgment on their declaratory judgment claim and on the counterclaims asserted by Lamorak. While that motion was pending before this Court, defendant filed a motion to realign the parties.

## II. Motion for Summary Judgment

### A. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact

in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is warranted if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

**B. Application**

**1. Law Governing Slip Reinsurance Agreements**

As an initial matter, plaintiffs assert that English law governs the Slip Reinsurance Agreements while defendant, not unsurprisingly, disputes that contention.

As a federal court sitting in diversity, this Court looks to the choice of law principles of the forum state to determine the substantive law applicable to this action. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Massachusetts courts have embraced a functional approach in

settling choice-of-law disputes, "looking to the Restatement (Second) of Conflict of Laws as one obvious source of guidance." Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 41 (1st Cir. 2020) (quotation and citations omitted).

The Court can find no precedent that supports Lamorak's effort to apply Restatement § 193, which supplies choice of law principles for contracts of fire, surety or casualty, to analyses regarding reinsurance contracts. Precedent, reflecting the substantive distinction between initial insurance contracts that underwrite damage and reinsurance contracts that indemnify risks associated with that damage, makes it clear that the principles of Restatement §§ 6 and 188 govern, rather than Restatement § 193. See FLS U.S. Holdings, Inc. v. Liberty Mut. Fire Ins. Co., No. 13-2511, 2015 WL 263827, at *6 (E.D. Pa. Jan. 21, 2015) ("It is important to remember that the relevant contacts for this analysis relate to the insurance contract, and not the event that gave rise to the coverage dispute."); Republic Ins. Co. v. Banco De Seguros Del Estado, No. 10 C 5039, 2013 WL 3874027, at *7 (N.D. Ill. July 26, 2013) ("[T]he location of the risks being insured is not a factor particularly relevant to the choice-of-law determination regarding a reinsurance contract".). To the extent that other courts have considered the question, they have concluded likewise. See, e.g., Int'l Ins. Co. v. Certain Underwriters at Lloyd's London,

No. 88 C 9838, 1991 WL 349907, at *10 (N.D. Ill. Sept. 16, 1991) (finding that "reinsurance is not a contract of fire, surety or casualty insurance" (citation omitted)). The applicable choice of law principles governing contract disputes, i.e. Restatement §§ 6 and 188, therefore apply. See 1A Couch on Ins. § 9:14 ("Reinsurance contracts are subject to the choice-of-law rules that apply to contracts generally to determine which jurisdiction's law should govern a dispute.").

Restatement § 188 provides that, in determining the applicable law to govern contractual disputes in the absence of an effective choice of law by the parties, a Court should consider: the place of contracting, the place of negotiation, the place of performance and the location of the contract's subject matter, as well as the domicile, residence, nationality, place of incorporation and place of business of the parties. Those factors "are to be evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 188(2) (1971). In applying them to reinsurance agreements,

> the state where the reinsurance certificate issued and the location where performance is expected, i.e. the place to which the ceding insurer must make its demand for payment, typically control for purposes of choice of law.

AIU Ins. Co. v. TIG Ins. Co., 934 F. Supp. 2d 594, 600 (S.D.N.Y. 2013), aff'd, 577 F. App'x 24 (2d Cir. 2014) (quotation omitted).

Even viewing the record in the light most favorable to the non-moving party, the record reveals that British law applies to the instant case as a matter of law. The parties do not dispute that the Slip Reinsurance Agreements were signed by representatives in England and it is consequently from there that the documents issued. See id. at 600-601. Moreover, the place of performance was England where defendant indisputably and repeatedly presented demands for payment. See Houston Cas. Co. v. Certain Underwriters at Lloyd's London, 51 F. Supp. 2d 789, 798 (S.D. Tex. 1999), aff'd sub nom., Houston Cas. Co. v. Certain Underwriters at Lloyd's, 252 F.3d 1357 (5th Cir. 2001) ("[T]he Underwriters' obligation to perform on the agreement would apparently arise in England upon presentation of a claim to the Underwriters." (citation omitted)). Lamorak attempts to undermine that conclusion by insisting that its billing was issued from Massachusetts but that fact is irrelevant because only plaintiffs' payment would have constituted performance. See AIU Ins. Co., 934 F. Supp. 2d at 601 ("[T]he place of performance is the place to which the ceding insurer must make its demand for payment." (quotation omitted)).

The other Restatement factors do not outweigh those considerations. Both parties admit that the entirety of the negotiations occurred in England and the parties are divided in terms of domicile, resident, nationality, place of incorporation and place of business on either side of the Atlantic. Defendant contends that Massachusetts law should apply because the defendant policy holder was domiciled in the Commonwealth and, therefore, the insured risk is located therein. As indicated supra, however, the situ of the risk is not particularly salient when, as here, the contract does not concern "a specific physical thing." Restatement § 188. The cases cited by Lamorak, which concern the insurance of physical items are thus of limited relevance.

The conclusion that British law applies here is firmly supported by precedent. In Houston Cas. Co. v. Certain Underwriters at Lloyd's, 252 F.3d 1357 (5th Cir. 2001), for example, the Fifth Circuit upheld the determination that British law governed a reinsurance agreement where: (1) a Texas insurance company hired a British broker to secure the agreement, (2) that broker engaged in negotiations and secured the relevant agreement with underwriters in Britain and (3) the contract was approved in Britain. See also Arkwright-Boston, 887 F.2d at 439 (applying North Carolina law when reinsurer was organized in and reinsurance contract was issued from North

Carolina); Stephens v. American Home Assurance Co., 811 F. Supp. 937, 946 (S.D.N.Y. 1993) (applying New York law when re-reinsurance agreements were solicited, negotiated, executed and performed in New York and the intermediary was based in New York).

### 2. LMRs Exposure Under Huntsville Settlement

Plaintiffs also request summary judgment foreclosing Lamorak from seeking indemnification in connection with a 2016 settlement between Lamorak and Olin. That settlement resolved certain outstanding insurance coverage disputes arising from a much earlier settlement between Lamorak and Olin that concerned an environmental site in Huntsville, Alabama. In 2016, the Olin Court issued a final judgment ordering Lamorak to pay Olin for damages and PJI associated with unpaid claims on that site. Lamorak and Olin subsequently entered a settlement agreement releasing all appeal rights for a total of $450,000. Lamorak seeks reimbursement from LMRs for a share of that settlement.

According to the plaintiffs, they are entitled to summary judgment on that issue because, after Lamorak presented billing associated with the settlement to LMRs in 2016, Lamorak never responded to requests for additional information, specifically requests to disaggregate that settlement between damages and PJI to determine coverage under the Slip Reinsurance Agreements.

LMRs claim that Lamorak has, moreover, abandoned the claim that LMRs should have paid Olin directly for damages associated with the Huntsville site by not raising the issue in a timely manner.

Lamorak contests those characterizations and disputes of material fact abound. LMRs, for instance, characterize their requests for additional information as coming from all the plaintiffs. In contrast, Lamorak asserts that only two LMRs ever raised questions regarding the indemnification sought and that those questions do not, in any event, excuse the other plaintiffs from making payment.

Although Lamorak fails to explain why it did not provide LMRs with a breakdown of the settlement amount, that apparent oversight does not, in itself, merit entry of summary judgment in favor of the plaintiffs. Factual questions persist with respect to communication surrounding the billing, in addition to other matters. For those reasons, the issue cannot be resolved at this stage.

**3. Chapter 93A Claims**

Lamorak alleges that LMRs engaged in unfair business practices in violation of Chapter 93A of the Massachusetts General Laws. In response, plaintiffs challenge not only the substantive merits of the claim but also whether the allegations satisfy the "jurisdictional threshold" of that provision. Warren

Env't, Inc. v. Source One Env't, Ltd., No. CV 18-11513-RGS, 2020 WL 1974256, at *10 (D. Mass. Apr. 24, 2020). As statutorily required, the party asserting violations of Chapter 93A bears the burden to prove that the conduct alleged occurred "primarily and substantially within" the Commonwealth. M.G.L. c. 93A, § 11.

The Supreme Judicial Court has held that determination must be made holistically:

> a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.

Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 474 (2003). The focus of that analysis is not, therefore, on "any particular factor" but rather the "purpose and scope of c. 93A." Id. However, in making the fact-intensive assessment, courts may consider, among other things:

> where the defendant committed the alleged deception, where the plaintiff was deceived and acted upon the deception, and where the plaintiff was harmed.

Arabian Support & Servs. Co., Ltd. v. Textron Sys. Corp., 943 F.3d 42, 47 (1st Cir. 2019) (citing Roche v. Royal Bank of Canada, 109 F.3d 820 (1st Cir. 1997).

In asserting that standard has been met, defendant highlights the in-person meeting between the representatives of LMRs and Lamorak that occurred in Massachusetts, communications

sent from and received in Massachusetts, and LMRs annual audits that took place in the state. Those facts are, however, insufficient to satisfy the jurisdictional requirement because, regardless of where meetings and communication occurred, "the core of the [alleged] misleading conduct" at issue, specifically the purported unfair business practices, did not occur "primarily and substantially in Massachusetts." Arabian Support & Servs. Co., Ltd. v. Textron Sys. Corp., 368 F. Supp. 3d 211, 230 (D. Mass.), aff'd, 943 F.3d 42 (1st Cir. 2019).

Lamorak's assertions amount to no more than evidence that Massachusetts was a pass-through location where information was shared among the parties and forwarded elsewhere. That does not amount to a "center of gravity." See also Sonoran Scanners, Inc. v. Perkinelmer, Inc., 585 F.3d 535, 546 (1st Cir. 2009) (concluding that Chapter 93A not applicable where allegedly deceptive statements were made in Massachusetts because losses accrued and associated decision-making occurred in Arizona). Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 45 (1st Cir. 2005), the only case cited by Lamorak in its initial response to plaintiffs' motion on this issue, does not support an alternative conclusion. In that case, the First Circuit found that Chapter 93A did not apply where the alleged misrepresentations were received primarily in Maine and where their impact was primarily felt there. Here, particularly where

none of the parties has even a corporate office in Massachusetts from which the allegedly deceptive activities could have originated or been acted upon, the alleged practices similarly lack a nexus with Massachusetts and Chapter 93A is inapplicable.

**4. Remaining Issues**

LMRs seek summary judgment on four remaining issues: (1) that the billing sent by Lamorak to LMRs in the wake of Lamorak’s 2018 settlement with Olin is deficient, (2) that neither PJI nor declaratory relief arising from the litigation between Lamorak and Olin is covered under the Slip Reinsurance Agreements, (3) that Lamorak’s allocation of its settlement with Olin for which Lamorak seeks renumeration inappropriately encompasses losses outside the scope of the Agreements, and (4) that the follow-the-settlements doctrine does not cure Lamorak’s defective 2018 billing. The resolution of each of these issues depends upon the terms of the contractual relationship between Lamorak and LMRs.

The parties agree that the Slip Reinsurance Agreements are central to that relationship but to little else. Under British law, found to be applicable, a contract is construed:

> from the perspective of what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean.

Pride Int'l, Inc. v. Tesco Corp. (US), No. CIV.A. H-12-2889, 2013 WL 2431980, at *4 (S.D. Tex. June 4, 2013) (quotations omitted), and cases cited. Extrinsic evidence is, thus, admissible in all circumstances to facilitate the examination of the "factual matrix and commercial purpose of a contract" to supplement, but not replace, the written contract. In re McMahon, 236 B.R. 295, 307 (S.D.N.Y. 1999).

In assessing "the interplay between English contract law and the American summary judgment standard"[,] District Judge Renee Bumb, sitting by designation in the District of Delaware, concluded that the suitability of summary judgment on issues of English contractual interpretation turns on whether the "underlying factual matrix" is disputed. Bayer CropScience AG v. Dow AgroSciences LLC, No. 126, 2013 WL 5539410, at *5 (D. Del. Oct. 7, 2013), aff'd, 580 F. App'x 909 (Fed. Cir. 2014). If, as in In re McMahon, 236 B.R. at 306, there are no disputed facts, a court can resolve such an issue on a motion for summary judgment. If disputed facts prevail, however, as in Pannell Kerr Forster Int'l Ass'n Ltd. v. Quek, 5 F. App'x 574, 577 (9th Cir. 2001), summary judgment is unwarranted. The Court agrees with that characterization of the relevant caselaw and applies it here, finding that disputed material facts foreclose summary judgment.

Enumerating each of the disputed material facts relevant to the factual matrix of the contract at issue would, indeed, be a formidable task. Rather than attempting to do so comprehensively, the Court emphasizes two. Parties disagree, on a fundamental level, whether the Slip Reinsurance Agreements constitute the relevant contracts at all. Lamorak contends that the Court must examine supplemental materials to decipher the meaning of those documents, whereas LMRs reject that argument. Uncertainty therefore exists regarding the terms of the Agreements themselves. Parties also dispute the meaning of those terms, highlighting divergent understandings of the central purpose and scope of the relationship. It is unsurprising that such factual questions remain when the central contracting documents are more than four decades old and extrinsic evidence of their execution is tenuous.

Plaintiffs have proffered the expert opinion of Christopher Foster ("Mr. Foster"), a solicitor of the Senior Courts of England and Wales, and a solicitor advocate with rights of audience in all Courts of England and Wales, to help the Court discern the contours of English law. Although Mr. Foster's report elucidates the interpretation of the Slip Reinsurance Agreements, he does not provide the Court with substantial guidance on the relevant factual questions nor is he in a position to do so.

## III. Motion to Realign Parties

In August, 2021, Lamorak filed a motion to realign the parties under Fed. R. Evid. 611(a), asserting that because it will bear the burden of proof on all claims at trial, it should enjoy the privileges of presenting its case as the party plaintiff, i.e. mounting its opening statement and case-in-chief first. LRMs oppose the motion, urging that Lamorak's motion is not only premature but also that good cause exists to permit LMRs to present first at trial. The current posture, in which LMRs are the plaintiffs and Lamorak is the defendant, stems from the original complaint in this case in which LMRs sought a declaratory judgment in Massachusetts state court that they owe nothing to Lamorak for any loss associated with Olin under the Slip Reinsurance Agreements.

A district court has the authority to control the order of proof and party alignment. See Helling v. McKinney, 509 U.S. 25, 35 (1993); Morales Feliciano v. Rullen, 278 F.3d 42, 57 (1st Cir. 2004) ("It is axiomatic that district courts enjoy wide latitude in matters concerning the ordering of proof and the presentation of evidence." (citations omitted)). See generally Fed. R. Evid. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence...."). Typically, the party who bears the

burden of proof serves as the party plaintiff and enjoys attendant privileges. See Fernandez v. Corporacion Insular De Seguros, 79 F.3d 207, 209 (1st Cir. 1996) (citing Martin v. Chesebrough-Pond's, Inc., 614 F.2d 498 (5th Cir.1980)). Here, LMRs do not dispute Lamorak's assertion that it bears the burden of proof on all pending claims. Rather, LMRs suggest that good cause exists to deviate from the general rule of proceeding.

As an initial matter, while LMRs cite precedent in which district courts have denied motions to realign parties where each party bears the burden of proof on some of legal issues in question, they provide no caselaw suggesting that it is appropriate to do so where, as here, the party seeking realignment bears the burden of proof on all pending claims. Moreover, LMRs' allegations that Lamorak's request should be denied because it engaged in forum shopping is underwhelming especially where it is just as easy to argue that LMRs engaged in identical behavior by initiating the pending action in state court before Lamorak sought indemnification.

The motion is timely and the case will be realigned.

**ORDER**

Plaintiffs' motion for summary judgment is, with respect to the law governing the Slip Reinsurance Agreements and defendant's Chapter 93A claims, **ALLOWED** but is otherwise **DENIED.**

For the foregoing reasons, defendant’s motion to realign the parties is **ALLOWED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated January 20, 2021